IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

------------------------------

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM. NO. 91-570 |
| | | |
| v. | : | VIOLATIONS: |
| | | |
| AARON JONES, | : | 21 U.S.C. §846 |
|   a/k/a "A," a/k/a "J" | | (Conspiracy) |
| JAMES COLE | : | 21 U.S.C. §848 |
| BRYAN THORNTON, | | (Continuing criminal |
|   a/k/a "Moochie" | : | enterprise) |
| LEONARD PATTERSON | | 21 U.S.C. §841(a)(1) |
|   a/k/a "Basil" | : | (Possession with |
| BERNARD FIELDS, | | intent to distribute |
|   a/k/a "Quadir," a/k/a "Q": | | and distribution of |
| JAMES PRICE, a/k/a "Squeezie" | | a controlled substance) |
| SAM BROWN, | : | 18 U.S.C. §922 |
|   a/k/a "Magic" | | (Felon possessing firearm) |
| KEVIN BOWMAN, | : | 18 U.S.C. §924 |
|   a/k/a "Black" | | (Use of a firearm during |
| REGINALD REAVES, | : | a drug trafficking crime) |
|   a/k/a "Reggie, a/k/a "R" | | 18 U.S.C. §2 |
| SHAWN DAVIS, a/k/a "SW1" | : | (Aiding and abetting) |
| LARRY BROWN | | 21 U.S.C. §853 |
| CHRISTOPHER LASTER, | : | (Forfeiture) |
|   a/k/a "Dirty Black" | | |
| JOSEPH COBB, a/k/a "Gump" | : | |
| LEROY JACKSON, a/k/a "Skip" | | |
| BARRY RICHARDSON, | : | |
|   a/k/a "Earl" | | |
| DARRELL REAVES | : | |
| MICHAEL WILLIAMS | | |
| ERIC PEARSON, | : | |
|   a/k/a "Buttons" | | |
| ANTHONY REID, a/k/a "Tone" | : | |
| DERRICK WILLIAMS, | | |
|   a/k/a "Little Derrick" | : | |
| RONALD MASON, a/k/a "Rock" | | |
| WILLIAM PERDUE, | : | |
|   a/k/a "Storm" | | |
| ANTHONY LONG, | : | |
|   a/k/a "T.L.," a/k/a "Tony" | | |
| DAVID BAYNHAM, | : | |
|   a/k/a "Fat Dave" | | |
| RODNEY CARSON, a/k/a "Frog": | | |
| EARL STEWART, | | |
|   a/k/a "Unc," a/k/a "Mustafa" | | |

------------------------------------

# I N D I C T M E N T

## COUNT ONE

THE GRAND JURY CHARGES THAT:

1.    From in or about late 1985 and continuing up to in or about September 1991, in the Eastern District of Pennsylvania, and elsewhere,

> AARON JONES, a/k/a "A," a/k/a "J"
> JAMES COLE
> BRYAN THORNTON, a/k/a "Moochie",
> LEONARD PATTERSON, a/k/a "Basil"
> BERNARD FIELDS, a/k/a "Quadir," a/k/a "Q"
> JAMES PRICE, a/k/a "Squeezie"
> SAM BROWN, a/k/a "Magic"
> KEVIN BOWMAN, a/k/a "Black"
> REGINALD REAVES, a/k/a "Reggie"
> SHAWN DAVIS, a/k/a "SW1"
> LARRY BROWN
> CHRISTOPHER LASTER, a/k/a "Dirty Black"
> JOSEPH COBB, a/k/a "Gump"
> LEROY JACKSON, a/k/a "Skip"
> BARRY RICHARDSON, a/k/a "Earl"
> DARRELL REAVES
> MICHAEL WILLIAMS
> ERIC PEARSON, a/k/a "Buttons"
> ANTHONY REID, a/k/a "Tone"
> DERRICK WILLIAMS, a/k/a "Little Derrick"
> RONALD MASON, a/k/a "Rock"
> WILLIAM PERDUE, a/k/a "Storm"
> ANTHONY LONG, a/k/a "T.L.," a/k/a "Tony"
> DAVID BAYNHAM, a/k/a "Fat Dave"
> RODNEY CARSON, a/k/a "Frog"
> EARL STEWART, a/k/a "Unc," a/k/a "Mustafa,"

the defendants herein, and Leroy Davis, a/k/a "Bucky", Mark Casey, a/k/a "Goldie", Derrick Allen, a/k/a "Bolo", Darrell Jamison, a/k/a "Fatsy", Joseph Theodore Simmons, a/k/a "Teddy", Allan Smith, Vernon Hawkins, Christopher Anderson, Dwight Sutton, Andre Crews and William Mead, named herein as co-conspirators but not charged in this Indictment, knowingly and intentionally did

unlawfully combine, conspire, confederate, and agree with each other and with other co-conspirators known and unknown to the Grand Jury, to distribute and possess with the intent to distribute five (5) kilograms or more of a substance containing a detectable amount of cocaine, a Schedule II narcotic controlled substance, and to distribute and possess with the intent to distribute a substance containing a detectable amount of heroin, in violation of Title 21, United States Code, Section 841(a)(1).

### STRUCTURE OF THE ORGANIZATION

2.    At various times relevant to this Indictment, AARON JONES, JAMES COLE, BRYAN THORNTON, LEONARD PATTERSON, BERNARD FIELDS, JAMES PRICE, SAM BROWN, KEVIN BOWMAN, REGINALD REAVES, SHAWN DAVIS, LARRY BROWN, CHRISTOPHER LASTER, JOSEPH COBB, LEROY JACKSON, BARRY RICHARDSON, DARRELL REAVES, MICHAEL WILLIAMS, ERIC PEARSON, ANTHONY REID, DERRICK WILLIAMS, DAVID BAYNHAM, RONALD MASON, WILLIAM PERDUE, ANTHONY LONG, RODNEY CARSON, and others known and unknown were members of an organization known as the "JBM" and at various times as the "Junior Black Mafia" and "the Family" (hereinafter JBM).

3.    At all times relevant to this Indictment, the business of the organization known as the JBM was the sale and distribution of cocaine, crack cocaine and heroin.

4.    At various times relevant to this Indictment, the JBM used violence and the threat of violence, including murders and attempted murders, to maintain and expand control of the drug business and to maintain internal discipline.

3

5.   At all times relevant to this Indictment, the JBM was headed by, in order of succession, JAMES COLE and AARON JONES. During various periods of time relevant to this Indictment, when JONES was not available, the JBM was supervised on his behalf by other individuals including BRYAN THORNTON and BERNARD FIELDS.

6.   At various times relevant to this Indictment, JAMES COLE, EARL STEWART and others would and did supply the JBM with cocaine.

7.   At various times relevant to this Indictment, the JBM was divided into squads, with each squad supervised by one or more high ranking members of the JBM including, as supervisors, BRYAN THORNTON, LEONARD PATTERSON, JAMES PRICE, SAM BROWN, KEVIN BOWMAN, REGINALD REAVES, LARRY BROWN, ERIC PEARSON, ANTHONY LONG, DERRICK WILLIAMS, RODNEY CARSON and others known and unknown. Each squad was responsible for the sale and distribution of drugs within a specified geographic area.

8.   At all times relevant to this Indictment, members of the JBM, including BERNARD FIELDS, SHAWN DAVIS, JAMES PRICE, SAM BROWN, DAVID BAYNHAM, RONALD MASON and others were responsible for delivering cocaine to members of the JBM for distribution and resale.

9.   At various times relevant to this Indictment, other members of the JBM, including, among others, SAM BROWN, ANTHONY REID, CHRISTOPHER LASTER, JOSEPH COBB, RONALD MASON, WILLIAM PERDUE and BARRY RICHARDSON, worked as enforcers for the JBM by committing and threatening acts of violence for the purpose of

4

controlling and expanding the drug business of the JBM and
maintaining internal discipline.

## MANNER AND MEANS OF THE CONSPIRACY

10.  It was part of the conspiracy that beginning in
approximately early 1986, JAMES COLE would and did supervise,
manage, organize and direct other members of the conspiracy, in
various drug related activities of the conspiracy.

11.  It was further part of the conspiracy that beginning in
approximately early 1986, JAMES COLE would and did purchase
multi-kilogram quantities of cocaine from cocaine suppliers in
Florida, California and elsewhere for sale and distribution by
other members of the conspiracy.

12.  It was further part of the conspiracy that sometime
between late 1987 and mid 1988, AARON JONES would and did begin
to exercise exclusive leadership of the JBM.

13.  It was further part of the conspiracy that AARON JONES
would and did continue to purchase multi-kilogram quantities of
cocaine from cocaine suppliers in California, Florida and
elsewhere.

14.  It was further part of the conspiracy that AARON JONES
would and did conduct meetings with members of the JBM where
JONES determined how much cocaine members of the JBM would
receive for distribution and resale to various members of the JBM
and others.

15.  It was further part of the conspiracy that BERNARD
FIELDS, SHAWN DAVIS, SAM BROWN, JAMES PRICE, RONALD MASON, DAVID

BAYNHAM and others, at the direction of AARON JONES and BRYAN
THORNTON, would and did deliver the cocaine to members of the JBM
and others, for distribution and resale.

16.   It was further part of the conspiracy that, at the
direction of AARON JONES and BRYAN THORNTON, cocaine was also
distributed to KEVIN BOWMAN, ANTHONY REID, ERIC PEARSON, REGINALD
REAVES, DARRELL REAVES, LARRY BROWN, DERRICK WILLIAMS, MICHAEL
WILLIAMS, LEONARD PATTERSON, ANTHONY LONG, RODNEY CARSON, Sam
Dyson, Darrell Jamison, Andre Crews, Mark Casey, Kevin Hawkins,
Leroy Davis and others, for distribution and resale.

17.   It was further part of the conspiracy that BERNARD
FIELDS, SHAWN DAVIS, JAMES PRICE, RONALD MASON and others, at the
direction of AARON JONES and BRYAN THORNTON, would and did
collect money from cocaine sales from members of the JBM and
others and deliver the money to AARON JONES and other high
ranking members of the JBM.

18.   It was further part of the conspiracy that various
members and associates of the JBM would and did often possess
large amounts of cash which represented the proceeds of drug
sales or money to be used for drug purchases.

19.   It was further part of the conspiracy that, to expand
and maintain its drug business, to promote internal discipline,
and to conceal its activities from law enforcement, members of
the JBM would and did murder, attempt to murder and conspire to
murder other members and associates of the JBM, and other drug
dealers who refused to purchase their drugs from the JBM.

6

20.   It was further part of the conspiracy that members of the JBM would and did threaten other drug dealers to "get down or lay down," meaning that they either had to purchase their drugs from the JBM or be seriously injured or killed.

21.   It was further part of the conspiracy that, in order to expand its control of the drug business, the JBM would and did murder, attempt to murder and conspire to murder members and associates of a rival drug organization headed by John Craig Haynes.

22.   It was further part of the conspiracy that members of the JBM would and did carry semi-automatic handgune and other firearms in order to protect themselves and their drug business and to threaten and inflict violence upon rival drug dealers.

23.   It was further part of the conspiracy that members and associates of the JBM would and did protect themselves from injury by rival drug dealers and others by wearing bullet proof vests or body armor.

24.   It was further part of the conspiracy that members and associates of the JBM would and did operate primarily in a way meant to conceal from law enforcement the existence of the conspiracy, the identity of its members and associates and the locations where members of the JBM discussed their drug business or stored or distributed drugs.

25.   It was further part of the conspiracy that, in order to conceal their drug proceeds from law enforcement and launder drug

money, members of the JBM would and did purchase automobiles in the names of other individuals.

26.  It was further part of the conspiracy that to conceal its activities from law enforcement, members of the JBM would and did use coded language to discuss drugs and their drug business.

### OTHER ASPECTS OF THE CONSPIRACY

27.  It was further part of the conspiracy that on or about April 15, 1986, JAMES COLE would and did transport approximately $98,770 from Philadelphia, Pennsylvania to Atlanta, Georgia, en route to Fort Lauderdale, Florida.

28.  It was further part of the conspiracy that, on various occasions from approximately early 1986 through approximately late 1986 or early 1987, RODNEY CARSON and Leroy Davis would and did purchase cocaine from SAM BROWN.

29.  It was further part of the conspiracy that in approximately late 1986, AARON JONES would and did instruct CARSON and Davis to deal directly with JONES rather than ordering cocaine through BROWN.

30.  It was further part of the conspiracy that from late 1986 or early 1987 through 1990, RODNEY CARSON and Leroy Davis would and did order their cocaine directly from AARON JONES and the cocaine would be delivered by BERNARD FIELDS, SHAWN DAVIS, JAMES PRICE, RONALD MASON or DAVID BAYNHAM.

31.  It was further part of the conspiracy that from approximately 1987 through approximately 1988, JOSEPH COBB and

8

others would and did sell cocaine which they received from RODNEY CARSON and Leroy Davis.

32.  It was further part of the conspiracy that in approximately 1988 and 1989 RODNEY CARSON and Leroy Davis would and did purchase approximately twenty-five (25) to fifty (50) kilograms of cocaine per week through AARON JONES.

33.  It was further part of the conspiracy that from approximately the end of 1985 through approximately mid 1986 KEVIN BOWMAN would and did supervise ANTHONY REID in the sale of heroin.

34.  It was further part of the conspiracy that, from approximately the end of 1985 through approximately mid 1986, KEVIN BOWMAN would and did supervise JAMES PRICE and Vernon Hawkins in the sale of cocaine.

35.  It was further part of the conspiracy that, from approximately the end of 1985 through approximately mid 1986, KEVIN BOWMAN would and did order cocaine from AARON JONES and that the cocaine would be delivered to BOWMAN's apartment by AARON JONES and others.

36.  It was further part of the conspiracy that, from approximately the end of 1985 through approximately mid 1986, JAMES PRICE and Vernon Hawkins, under the supervision of KEVIN BOWMAN, would and did "cap" cocaine, or package it in smaller quantities for resale, at BOWMAN's apartment.

37.  It was further part of the conspiracy that, from the end of 1985 through approximately mid 1986, AARON JONES would and

9

did routinely come to KEVIN BOWMAN's apartment to deliver
cocaine, to monitor the drug operation and to discuss drug
proceeds with BOWMAN.

38.   It was further part of the conspiracy that, at various
times relevant to this Indictment, high ranking members of the
JBM, including AARON JONES, BRYAN THORNTON, KEVIN BOWMAN, JAMES
PRICE, BERNARD FIELDS, REGINALD REAVES, SAM BROWN, ERIC PEARSON,
LEONARD PATTERSON, Mark Casey, Leroy Davis and others would and
did wear gold rings with the initials JBM spelled out in
diamonds.

39.   It was further part of the conspiracy that in
approximately 1987, AARON JONES and LEONARD PATTERSON would and
did supervise and direct SHAWN DAVIS, Dwight Sutton and others in
the operation of a crack house from which crack cocaine was sold.

40.   It was further part of the conspiracy that in
approximately May 1987, JAMES PRICE and LEONARD PATTERSON would
and did solicit Dwight Sutton to drive to Florida with BERNARD
FIELDS for the purpose of picking up cocaine.

41.   It was further part of the conspiracy that in
approximately May 1987, BERNARD FIELDS and Dwight Sutton would
and did travel to Florida and return to Philadelphia with
approximately ten (10) kilograms of cocaine which FIELDS and
Sutton delivered to AARON JONES, LEONARD PATTERSON, KEVIN BOWMAN,
JAMES PRICE and SAM BROWN in Philadelphia, Pennsylvania.

10

42.   It was further part of the conspiracy that in approximately June 1987, BERNARD FIELDS and Dwight Sutton would and did travel to Florida for the purpose of picking up cocaine.

43.   It was further part of the conspiracy that in approximately June 1987, AARON JONES would and did travel to Florida to resolve a dispute involving the cocaine which was supposed to be picked up by FIELDS and Sutton.

44.   It was further part of the conspiracy that once AARON JONES had resolved the dispute, BERNARD FIELDS and Dwight Sutton would and did return to Philadelphia with approximately ten (10) kilograms of cocaine which they delivered to AARON JONES, LEONARD PATTERSON, KEVIN BOWMAN, JAMES PRICE and SAM BROWN in Philadelphia, Pennsylvania.

45.   It was further part of the conspiracy that in approximately the summer of 1987, BERNARD FIELDS and Dwight Sutton would and did travel to Florida and return to Philadelphia with approximately fifty (50) kilograms of cocaine which they delivered to AARON JONES, LEONARD PATTERSON, KEVIN BOWMAN, JAMES PRICE and SAM BROWN in Philadelphia, Pennsylvania.

46.   It was further part of the conspiracy that in approximately the summer of 1987, JAMES COLE would and did deliver approximately one-hundred (100) kilograms of cocaine to BERNARD FIELDS and Dwight Sutton in Florida, which kilograms of cocaine FIELDS and Sutton delivered to AARON JONES, LEONARD PATTERSON, KEVIN BOWMAN, JAMES PRICE and SAM BROWN in Philadelphia Pennsylvania.

11

47. It was further part of the conspiracy that in approximately the summer of 1987, DAVID BAYNHAM, Dwight Sutton and others would and did travel to Florida and return to Philadelphia with approximately one hundred (100) kilograms of cocaine which they delivered to AARON JONES, LEONARD PATTERSON, KEVIN BOWMAN, JAMES PRICE and SAM BROWN in Philadelphia Pennsylvania.

48. It was further part of the conspiracy that in approximately the summer of 1987, BERNARD FIELDS, DAVID BAYNHAM, Dwight Sutton and another individual would and did transport one hundred (100) kilograms of cocaine from Florida for the JBM which they delivered to AARON JONES, SAM BROWN and other members of the JBM in Philadelphia Pennsylvania.

49. It was further part of the conspiracy that in approximately the summer of 1987, BERNARD FIELDS and Dwight Sutton would and did travel to Florida and return to Philadelphia with between fifty (50) and one hundred (100) kilograms of cocaine which they delivered to AARON JONES and other members of the JBM in Philadelphia, Pennsylvania.

50. It was further part of the conspiracy that in the summer of 1987, REGINALD REAVES would and did sell Darrell Jamison approximately eighteen (18) ounces of cocaine per week.

51. It was further part of the conspiracy that on or about October 26, 1987, LEONARD PATTERSON would and did possess two (2) ziplock bags containing a total of approximately three (3) grams of cocaine.

12

52.   It was further part of the conspiracy that in approximately October 1987, DAVID BAYNHAM and Dwight Sutton would and did travel to Florida and return with approximately one hundred (100) kilograms of cocaine which they delivered to AARON JONES and other members of the JBM in Philadelphia, Pennsylvania.

53.   It was further part of the conspiracy that in approximately October 1987, JAMES PRICE, LEONARD PATTERSON and KEVIN BOWMAN would and did sell Michael Lyons approximately one (1) kilogram of cocaine.

54.   It was further part of the conspiracy that in approximately the winter of 1987/1988, JAMES COLE informed EARL STEWART that he was looking for a new large scale drug supplier because his Florida source of supply was drying up.

55.   It was further part of the conspiracy that in approximately the winter of 1987/1988, JAMES COLE would and did purchase approximately twenty (20) kilograms of cocaine from EARL STEWART in Philadelphia, Pennsylvania for which COLE made a partial payment to STEWART of approximately $200,000 and then paid the balance approximately ten (10) days later.

56.   It was further part of the conspiracy that in approximately the winter of 1987/1988, EARL STEWART transported approximately fifty (50) kilograms of cocaine from Los Angeles, California and met with JAMES COLE in Philadelphia, Pennsylvania for the purpose of delivering the cocaine to the JBM.

57.   It was further part of the conspiracy that JAMES COLE would and did direct EARL STEWART to transport the approximately

13

fifty (50) kilograms of cocaine to an apartment in Philadelphia, Pennsylvania where Stewart was to deliver it to AARON JONES and the JBM.

58. It was further part of the conspiracy that when EARL STEWART arrived at the apartment, AARON JONES would and did direct other members of the JBM to unload the cocaine from STEWART's car.

59. It was further part of the conspiracy that AARON JONES would and did give EARL STEWART approximately $200,000 or more as partial payment for the approximately fifty (50) kilograms of cocaine.

60. It was further part of the conspiracy that on or about April 8, 1988, Mark Casey would and did possess a semi-automatic pistol.

61. It was further part of the conspiracy that on or about April 16, 1988, LEONARD PATTERSON would and did shoot and kill John Wesley Tate.

62. It was further part of the conspiracy that on or about July 12, 1988, ANTHONY REID would and did shoot and kill Mark Lisby.

63. It was further part of the conspiracy that in approximately the summer of 1988, AARON JONES, BERNARD FIELDS and SAM BROWN would and did have a meeting with Andre Crews during which JONES attempted to persuade Crews to buy his cocaine from the JBM.

14

64.   It was further part of the conspiracy that approximate-
ly two to three weeks after the meeting described in the above
paragraph, Crews met with AARON JONES, BERNARD FIELDS, BRYAN
THORNTON, REGINALD REAVES, BARRY RICHARDSON and Leroy Davis,
during which meeting Crews agreed to buy cocaine from the JBM.

65.   It was further part of the conspiracy that from
approximately the summer of 1988 through approximately the summer
of 1989, Crews would and did purchase cocaine from AARON JONES
and the JBM, which cocaine was usually delivered by BERNARD
FIELDS and SHAWN DAVIS.

66.   It was further part of the conspiracy that in
approximately mid 1988, AARON JONES, KEVIN BOWMAN and ANTHONY
REID would and did ask John Craig Haynes if he was ready to start
purchasing cocaine from the JBM.

67.   It was further part of the conspiracy that from
approximately mid 1988 through approximately mid 1989, Darrell
Jamison purchased approximately one (1) kilogram of cocaine per
week from AARON JONES and the JBM, which cocaine was usually
delivered to Jamison by BERNARD FIELDS or SHAWN DAVIS.

68.   It was further part of the conspiracy that on or about
October 2, 1988, DERRICK WILLIAMS and another individual would
and did attempt to murder Bobby Little.

69.   It was further part of the conspiracy that in
approximately mid to late 1988, JAMES COLE would and did purchase
approximately four (4) kilograms of cocaine from EARL STEWART on

15

two separate occasions, for a total of approximately eight (8) kilograms.

70.  It was further part of the conspiracy that on or about December 12, 1988, JAMES PRICE would and did possess approximately fourteen (14) kilograms of cocaine in Philadelphia, Pennsylvania.

71.  It was further part of the conspiracy that in approximately late 1988, DERRICK WILLIAMS and another individual would and did sell Joseph Theodore Simmons approximately nine (9) ounces of cocaine.

72.  It was further part of the conspiracy that, in approximately December 1988, RONALD MASON, while armed with an Uzi type sub-machine gun, would and did accompany Mark Casey when he conducted drug business with Joseph Theodore Simmons.

73.  It was further part of the conspiracy that beginning in approximately late 1988 and continuing through approximately the spring of 1989, DERRICK WILLIAMS would and did collect money from Joseph Theodore Simmons which Simmons owed to Mark Casey for cocaine Simmons had purchased from Casey.

74.  It was further part of the conspiracy that in approximately the winter of 1988/1989, AARON JONES and the JBM would and did purchase approximately one hundred (100) kilograms of cocaine from EARL STEWART, which cocaine, at the direction of JONES, was unloaded from STEWART's vehicle by BERNARD FIELDS and SHAWN DAVIS.

75. It was further part of the conspiracy that approximately ten (10) days after the delivery of the approximately one hundred (100) kilograms of cocaine referenced in the above paragraph, AARON JONES would and did give EARL STEWART a garbage bag containing approximately in excess of $200,000 as partial payment for the cocaine.

76. It was further part of the conspiracy that on or about January 26, 1989, LEONARD PATTERSON would and did possess a 9 mm semi-automatic pistol.

77. It was further part of the conspiracy that on or about February 2, 1989, BERNARD FIELDS, CHRISTOPHER LASTER, SHAWN DAVIS, RONALD MASON, KEVIN BOWMAN, JOSEPH COBB, WILLIAM PERDUE and Derrick Allen would and did shoot and attempt to kill Terrence Goss, a/k/a Papers, an associate of John Craig Haynes.

78. It was further part of the conspiracy that on or about February 15, 1989, RONALD MASON would and did shoot and attempt to kill Allen "Paddles" Parker, a/k/a Allen Green.

79. It was further part of the conspiracy that on or about February 21, 1989, AARON JONES, BRYAN THORNTON and SAM BROWN would and did attempt to murder Richard Isaacs by shooting him approximately ten (10) times.

80. It was further part of the conspiracy that in approximately March 1989, DERRICK WILLIAMS would and did deliver approximately one (1) kilogram of cocaine to Joseph Theodore Simmons.

81.  It was further part of the conspiracy that on or about March 13, 1989, at the direction of AARON JONES, KEVIN BOWMAN and ANTHONY REID would and did shoot and kill Neil Wilkinson and attempt to murder Darryl Woods.

82.  It was further part of the conspiracy that on or about March 20, 1989, KEVIN BOWMAN, CHRISTOPHER LASTER and ANTHONY REID would and did attempt to murder John Craig Haynes near City Hall in Philadelphia, Pennsylvania.

83.  It was further part of the conspiracy that on or about March 21, 1989, JAMES COLE would and did possess a fully loaded .45 caliber semi-automatic pistol and a bullet proof vest.

84.  It was further part of the conspiracy that on or about April 6, 1989, Darrell Jamison would and did possess approximately one (1) kilogram of cocaine which he had purchased from AARON JONES and BERNARD FIELDS.

85.  It was further part of the conspiracy that in approximately April 1989, BRYAN THORNTON, Kevin Hawkins and Sam Dyson would and did sell approximately one (1) kilogram of cocaine to Steven Woodland and Raheen.

86.  It was further part of the conspiracy that in approximately April 1989, BERNARD FIELDS, SHAWN DAVIS and BARRY RICHARDSON would and did possess approximately fifty (50) to seventy-five (75) kilograms of cocaine in the vicinity of 52nd and Baltimore Avenue in Philadelphia, Pennsylvania.

87.  It was further part of the conspiracy that in approximately May 1989, SHAWN DAVIS, DERRICK WILLIAMS and William

18

Mead would and did sell approximately one (1) kilogram of cocaine to Diego Crews.

88. It was further part of the conspiracy that on or about June 20, 1989, RONALD MASON would and did possess a 9mm semi-automatic pistol.

89. It was further part of the conspiracy that on or about July 11, 1989, AARON JONES would and did order CHRISTOPHER LASTER, WILLIAM PERDUE, JOSEPH COBB and others, all enforcers for the JBM, to go to 24th and Moore Streets in Philadelphia, Pennsylvania, to kill Craig Haynes.

90. It was further part of the conspiracy that in approximately mid 1989, EARL STEWART would and did sell approximately one hundred and fifty (150) kilograms of cocaine to AARON JONES and the JBM, which STEWART delivered to BERNARD FIELDS and SHAWN DAVIS.

91. It was further part of the conspiracy that in approximately the latter half of 1989, EARL STEWART and his Mexican cocaine suppliers would and did meet with AARON JONES at the Adams Mark Hotel, in Philadelphia, Pennsylvania for the purpose of discussing their drug business.

92. It was further part of the conspiracy that following the meeting at the Adams Mark Hotel, EARL STEWART and his Mexican cocaine suppliers would and did meet with AARON JONES at JONES' apartment in Philadelphia, Pennsylvania for the purpose of the Mexicans showing JONES how to properly package drug money.

19

93.  It was further part of the conspiracy that in approximately the latter half of 1989, BERNARD FIELDS and EARL STEWART would and did transport approximately $250,000 to Texas as partial payment from the JBM for cocaine received through STEWART from his Mexican cocaine suppliers.

94.  It was further part of the conspiracy that on or about October 12, 1989, BRYAN THORNTON, KEVIN BOWMAN, REGINALD REAVES and BARRY RICHARDSON were together in a residence located at 1905 Wynnefield Terrace, Philadelphia, Pennsylvania and at that time, REGINALD REAVES and BARRY RICHARDSON would and did each possess a semi-automatic pistol.

95.  It was further part of the conspiracy that, in approximately the fall of 1989, at the direction of AARON JONES, CHRISTOPHER LASTER and RODNEY CARSON would and did travel to the vicinity of 20th and Cecil Streets in Philadelphia, Pennsylvania for the purpose of murdering Stefan Henry.

96.  It was further part of the conspiracy that in approximately late 1989, EARL STEWART would and did sell approximately two hundred and thirty (230) kilograms of cocaine to AARON JONES and the JBM, which STEWART delivered to BERNARD FIELDS and SHAWN DAVIS.

97.  It was further part of the conspiracy that in approximately late 1989, BRYAN THORNTON would and did pay EARL STEWART approximately $275,000 for cocaine purchased by the JBM.

98.  It was further part of the conspiracy that in approximately December 1989, BRYAN THORNTON and BERNARD FIELDS

would and did sell approximately nine (9) ounces of cocaine to
Diego Crews.

99. It was further part of the conspiracy that in
approximately the winter of 1989/1990, LARRY BROWN would and did
purchase approximately nine (9) ounces of cocaine for $6,000 from
Allan Smith.

100. It was further part of the conspiracy that in
approximately the winter of 1989/1990, approximately one week
following the transaction described in the above paragraph, LARRY
BROWN would and did make a second purchase of approximately nine
(9) ounces of cocaine for $6,000 from Allan Smith.

101. It was further part of the conspiracy that in
approximately the winter of 1989/1990, LARRY BROWN would and did
purchase approximately one (1) kilogram of cocaine from Allan
Smith.

102. It was further part of the conspiracy that in
approximately April or May 1990, BRYAN THORNTON, REGINALD REAVES
and BERNARD FIELDS would and did agree to sell Diego Crews
approximately one (1) kilogram of cocaine.

103. It was further part of the conspiracy that on or about
June 12, 1990, REGINALD REAVES would and did give a sample of
cocaine to William Mead who, unbeknownst to REAVES, was, at that
time, a cooperating witness working under the direction of the
Federal Bureau of Investigation ("FBI").

104. It was further part of the conspiracy that in approximately the first half of 1990, BRYAN THORNTON would and did deliver cocaine to RODNEY CARSON.

105. It was further part of the conspiracy that in approximately June or July 1990, BERNARD FIELDS would and did make two (2) separate deliveries of cocaine to SAM BROWN and Christopher Anderson, with each delivery consisting of approximately nine (9) ounces of cocaine.

106. It was further part of the conspiracy that in approximately June or July 1990, SAM BROWN and Christopher Anderson would and did deliver to AARON JONES proceeds from drug sales in the amount of approximately $14,000.

107. It was further part of the conspiracy that beginning in approximately the summer of 1990 and continuing through approximately November or December 1990, JAMES COLE would and did make approximately four (4) deliveries of cocaine to SAM BROWN and Christopher Anderson, for a total of approximately five and one half (5 1/2) kilograms of cocaine.

108. It was further part of the conspiracy that beginning in approximately the summer of 1990 and continuing through approximately November or December 1990, SAM BROWN, DAVID BAYNHAM and Christopher Anderson would and did deliver cocaine to REGINALD REAVES, LARRY BROWN, LEROY JACKSON, MICHAEL WILLIAMS, Mark Brown and others.

109. It was further part of the conspiracy that, in approximately the summer of 1990, REGINALD REAVES would and did

direct William Mead to drive DARRELL REAVES to deliver cocaine to Ronnie Graham.

110. It was further part of the conspiracy that on or about August 1, 1990, MICHAEL WILLIAMS would and did sell approximately three (3) ounces of cocaine for approximately $3,600 to William Mead who, unbeknownst to WILLIAMS, was, at that time, a cooperating witness working under the direction of the FBI.

111. It was further part of the conspiracy that on or about August 2, 1990, LARRY BROWN would and did sell approximately nine (9) ounces of cocaine on consignment to Darrell Jamison, who, unbeknownst to BROWN, was, at that time, a cooperating witness working under the direction of the Drug Enforcement Administration ("DEA").

112. It was further part of the conspiracy that on or about August 6, 1990, LARRY BROWN would and did receive approximately $9,000 from cooperating witness Darrell Jamison as payment for the cocaine sold on or about August 2, 1990.

113. It was further part of the conspiracy that in approximately the summer of 1990, LEROY JACKSON would and did offer to sell three (3) ounces of cocaine to William Mead, who unbeknownst to JACKSON, was, at that time, a cooperating witness working under the direction of the FBI.

114. It was further part of the conspiracy that in approximately August 1990, at the direction of REGINALD REAVES and SAM BROWN, Christopher Anderson and others would and did attempt to kill Alphonso Caldwell, a/k/a Fony.

23

115. It was further part of the conspiracy that on or about August 31, 1990, LEROY JACKSON would and did sell approximately six (6) ounces of crack cocaine, for approximately $7400, to Special Agent Philip Davis who was working undercover and Darrell Jamison, who, unbeknownst to JACKSON, was, at that time, a cooperating witness working under the direction of the DEA.

116. It was further part of the conspiracy that on or about September 1, 1990, BERNARD FIELDS would and did travel to the Richard Allen Homes in Philadelphia, Pennsylvania for the purpose of collecting drug money.

117. It was further part of the conspiracy that on or about October 12, 1990, REGINALD REAVES would and did sell approximately three (3) ounces of cocaine for approximately $3,000 to William Mead who, unbeknownst to REAVES, was, at that time, a cooperating witness working under the direction of the FBI.

118. It was further part of the conspiracy that on or about October 26, 1990, BERNARD FIELDS would and did sell approximately sixty-nine (69) packets of cocaine, containing a total of approximately eleven (11) grams of cocaine for approximately $500 to Otis Weakly, who, unbeknownst to FIELDS, was, at that time, a cooperating witness working under the direction of the FBI.

119. It was further part of the conspiracy that on or about November 25, 1990, BERNARD FIELDS would and did offer to give cooperating witness Otis Weakly $10,000 worth of crack cocaine if Weakly would provide FIELDS with a house from which FIELDS could sell crack cocaine.

24

120. It was further part of the conspiracy that on or about December 17, 1990 BERNARD FIELDS and SHAWN DAVIS, while in possession of guns, would and did sell approximately two (2) ounces of cocaine for $2600 to Otis Weekly who, unbeknownst to FIELDS and DAVIS, was, at that time, a cooperating witness working under the direction of the FBI.

121. It was further part of the conspiracy that in approximately February 1991, SAM BROWN would and did ask EARL STEWART to sell him one (1) kilogram of cocaine on consignment.

122. It was further part of the conspiracy that on or about February 19, 1991, BERNARD FIELDS and SHAWN DAVIS would and did sell eleven (11) bags of heroin, containing approximately eleven (11) grams of heroin, for $1,100, to Otis Weekly who, unbeknownst to FIELDS and DAVIS, was, at that time, a cooperating witness working under the direction of the FBI.

123. It was further part of the conspiracy that on or about June 17, 1991, BERNARD FIELDS, while armed with a semi-automatic pistol, would and did sell approximately one hundred and thirty (130) grams of heroin for $3600 to Otis Weekly who, unbeknownst to FIELDS was, at that time, a cooperating witness working under the direction of the FBI.

124. It was further part of the conspiracy that on or about August 23, 1991, BERNARD FIELDS would and did purchase and receive what he believed to be twenty (20) kilograms of cocaine, but what was actually ten (10) kilograms of real cocaine and ten (10) kilograms of "sham" cocaine, from EARL STEWART who,

25

unbeknownst to FIELDS was, at that time, a cooperating witness working under the direction of the FBI.

125. It was further part of the conspiracy that, during the above described transaction on or about August 23, 1991, BERNARD FIELDS would and did possess a loaded .380 semi-automatic pistol.

126. It was further part of the conspiracy that on or about August 23, 1991, BERNARD FIELDS would and did possess two (2) loaded revolvers at his residence located at 1513 Newkirk Street, Philadelphia, Pennsylvania.

All in violation of Title 21, United States Code, Section 846.

## COUNT TWO

THE GRAND JURY FURTHER CHARGES THAT:

    1.    From in or about late 1985 through in or about
September 1991, in the Eastern District of Pennsylvania and
elsewhere, defendant JAMES COLE knowingly and intentionally did
engage in a continuing criminal enterprise in that he did violate
Title 21, United States Code, Sections 841(a)(1) and 846,
including but not limited to Counts One, Five, Six, Seven and
Eight of this Indictment, which are incorporated by reference
herein and did commit other violations of those same statutes
which were part of a continuing series of violations of those
same statutes undertaken by the defendant in concert with at
least five other persons with respect to whom JAMES COLE occupied
a position of organizer, supervisor and manager, and from which
continuing series of violations, defendant JAMES COLE  obtained
substantial income and resources.

    2.    That the defendant JAMES COLE was the principal
administrator, organizer and leader of the Continuing Criminal
Enterprise and was one of several such principal administrators,
organizers and leaders; and the violations of Title 21, United
States Code, Sections 841(a)(1) and 846 that the defendant, JAMES
COLE, committed as part of a continuing series of violations
involved at least 150 kilograms of cocaine, a Schedule II
narcotic controlled substance, that is an amount at least 300
times the quantity of cocaine described in Subsection
841(b)(1)(B) of Title 21, United States Code.

All in violation of Title 21, United States Code, Section 848.

## COUNT THREE

THE GRAND JURY FURTHER CHARGES THAT:

1.    From in or about late 1985 through in or about September 1991, in the Eastern District of Pennsylvania and elsewhere, defendant AARON JONES, a/k/a "A," a/k/a "J", knowingly and intentionally did engage in a continuing criminal enterprise in that he did violate Title 21, United States Code, Sections 841(a)(1) and 846, including but not limited to Counts One, Eight, Nine, Ten and Eleven of this Indictment, which are incorporated by reference herein and did commit other violations of those same statutes which were part of a continuing series of violations of those same statutes undertaken by the defendant in concert with at least five other persons with respect to whom AARON JONES occupied a position of organizer, supervisor and manager, and from which continuing series of violations, defendant AARON JONES obtained substantial income and resources.

2.    That the defendant AARON JONES, a/k/a "A," a/k/a "J" was the principal administrator, organizer and leader of the Continuing Criminal Enterprise and was one of several such principal administrators, organizers and leaders; and the violations of Title 21, United States Code, Sections 841(a)(1) and 846 that the defendant, AARON JONES, committed as part of a continuing series of violations involved at least 150 kilograms of cocaine, a Schedule II narcotic controlled substance, that is an amount at least 300 times the quantity of cocaine described in Subsection 841(b)(1)(B) of Title 21, United States Code.

All in violation of Title 21, United States Code, Section 848.

## COUNT FOUR

THE GRAND JURY FURTHER CHARGES THAT:

1.    From in or about late 1985 through in or about September 1991, in the Eastern District of Pennsylvania and elsewhere, defendant BRYAN THORNTON, a/k/a "Moochie," knowingly and intentionally did engage in a continuing criminal enterprise in that he did violate Title 21, United States Code, Sections 841(a)(1) and 846, including but not limited to Counts One and Eleven of this Indictment, which are incorporated by reference herein and did commit other violations of those same statutes which were part of a continuing series of violations of those same statutes undertaken by the defendant in concert with at least five other persons with respect to whom BRYAN THORNTON occupied a position of organizer, supervisor and manager, and from which continuing series of violations, defendant BRYAN THORNTON obtained substantial income and resources.

2.    That the defendant BRYAN THORNTON, a/k/a "Moochie," was the principal administrator, organizer and leader of the Continuing Criminal Enterprise and was one of several such principal administrators, organizers and leaders; and the violations of Title 21, United States Code, Sections 841(a)(1) and 846 that the defendant, BRYAN THORNTON, committed as part of a continuing series of violations involved at least 150 kilograms of cocaine, a Schedule II narcotic controlled substance, that is an amount at least 300 times the quantity of cocaine described in Subsection 841(b)(1)(B) of Title 21, United States Code.

31

All in violation of Title 21, United States Code, Section 848.

## COUNT FIVE

THE GRAND JURY FURTHER CHARGES THAT:

In or about the winter of 1987/1988, in the Eastern District of Pennsylvania and elsewhere, JAMES COLE did knowingly and intentionally possess with intent to distribute five (5) kilograms or more of a substance containing a detectable amount of cocaine, a Schedule II narcotic controlled substance, to wit: approximately twenty (20) kilograms of cocaine.

In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

## COUNT SIX

THE GRAND JURY FURTHER CHARGES THAT:

In or about mid to late 1988, in the Eastern District of Pennsylvania and elsewhere, JAMES COLE did knowingly and intentionally possess with intent to distribute a substance containing a detectable amount of cocaine, a Schedule II narcotic controlled substance, to wit: approximately four (4) kilograms of cocaine.

In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

## COUNT SEVEN

THE GRAND JURY FURTHER CHARGES THAT:

In or about mid to late 1988, in the Eastern District of Pennsylvania and elsewhere, JAMES COLE did knowingly and intentionally possess with intent to distribute a substance containing a detectable amount of cocaine, a Schedule II narcotic controlled substance, to wit: an additional approximately four (4) kilograms of cocaine.

In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

## COUNT EIGHT

THE GRAND JURY FURTHER CHARGES THAT:

In or about the winter of 1987/1988, in the Eastern District of Pennsylvania and elsewhere, JAMES COLE and AARON JONES, a/k/a "A," a/k/a "J," did knowingly and intentionally possess with intent to distribute five (5) kilograms or more of a substance containing a detectable amount of cocaine, a Schedule II narcotic controlled substance, to wit: approximately fifty (50) kilograms of cocaine.

In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

36

## COUNT NINE

THE GRAND JURY FURTHER CHARGES THAT:

In or about the winter of 1988/1989, in the Eastern District of Pennsylvania and elsewhere, AARON JONES, a/k/a "A," a/k/a "J," BERNARD FIELDS, a/k/a "Quadir,", a/k/a "Q," and SHAWN DAVIS, a/k/a "SW1," did knowingly and intentionally possess with intent to distribute five (5) kilograms or more of a substance containing a detectable amount of cocaine, a Schedule II narcotic controlled substance, to wit: approximately one-hundred (100) kilograms of cocaine.

In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

## COUNT TEN

THE GRAND JURY FURTHER CHARGES THAT:

In or about mid 1989, in the Eastern District of Pennsylvania and elsewhere, AARON JONES, a/k/a "A," a/k/a "J," BERNARD FIELDS, a/k/a "Quadir,", a/k/a "Q," and SHAWN DAVIS, a/k/a "SW1,", did knowingly and intentionally possess with intent to distribute five (5) kilograms or more of a substance containing a detectable amount of cocaine, a Schedule II narcotic controlled substance, to wit: approximately one-hundred and fifty (150) kilograms of cocaine.

In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

## COUNT ELEVEN

THE GRAND JURY FURTHER CHARGES THAT:

   In or about late 1989, in the Eastern District of Pennsylvania and elsewhere, AARON JONES, a/k/a "A," a/k/a "J," BERNARD FIELDS, a/k/a "Quadir,", a/k/a "Q," SHAWN DAVIS, a/k/a "SW1," and BRYAN THORNTON, a/k/a "Moochie" did knowingly and intentionally possess with intent to distribute five (5) kilograms or more of a substance containing a detectable amount of cocaine, a Schedule II narcotic controlled substance, to wit: approximately two hundred and thirty (230) kilograms of cocaine.

   In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

## COUNT TWELVE

THE GRAND JURY FURTHER CHARGES THAT:

On or about October 26, 1990, in the Eastern District of Pennsylvania and elsewhere, BERNARD FIELDS, a/k/a "Quadir," a/k/a "Q", did knowingly and intentionally distribute and cause to be distributed a substance containing a detectable amount of cocaine, a Schedule II narcotic controlled substance, to wit: approximately sixty-nine (69) packets of cocaine, containing a total of approximately eleven (11) grams of cocaine, to Otis Weekly.

In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

## COUNT THIRTEEN

THE GRAND JURY FURTHER CHARGES THAT:

On or about December 17, 1990, in the Eastern District of Pennsylvania and elsewhere, BERNARD FIELDS, a/k/a "Quadir," a/k/a "Q" and SHAWN DAVIS, a/k/a "SW1," did knowingly and intentionally distribute and cause to be distributed a substance containing a detectable amount of cocaine, a Schedule II narcotic controlled substance, to wit: approximately two (2) ounces of cocaine to Otis Weekly.

In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

41

## COUNT FOURTEEN

THE GRAND JURY FURTHER CHARGES THAT:

On or about December 17, 1990, in the Eastern District of Pennsylvania and elsewhere, BERNARD FIELDS, a/k/a "Quadir," a/k/a "Q" and SHAWN DAVIS, a/k/a "SW1," did knowingly and intentionally use a firearm, during and in relation to a drug trafficking crime for which they may be prosecuted in a court of the United States, that is, distribution of a controlled substance as charged in Count Thirteen (13) of this Indictment.

In violation of Title 18, United States Code, Section 924(c)(1).

42

## COUNT FIFTEEN

THE GRAND JURY FURTHER CHARGES THAT:

On or about February 19, 1991, in the Eastern District of Pennsylvania and elsewhere, BERNARD FIELDS, a/k/a "Quadir," a/k/a "Q" and SHAWN DAVIS, a/k/a "SW1," did knowingly and intentionally distribute and cause to be distributed a substance containing a detectable amount of heroin, a Schedule II narcotic controlled substance, to wit: approximately eleven (11) grams of heroin to Otis Weekly.

In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

## COUNT SIXTEEN

THE GRAND JURY FURTHER CHARGES THAT:

On or about June 17, 1991, in the Eastern District of Pennsylvania and elsewhere, BERNARD FIELDS, a/k/a "Quadir," a/k/a "Q" did knowingly and intentionally distribute and cause to be distributed 100 grams or more of a substance containing a detectable amount of heroin, a Schedule II narcotic controlled substance, to wit: approximately one-hundred and thirty (130) grams of heroin to Otis Weekly.

In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

44

## COUNT SEVENTEEN

THE GRAND JURY FURTHER CHARGES THAT:

On or about August 1, 1990, in the Eastern District of Pennsylvania and elsewhere, MICHAEL WILLIAMS, did knowingly and intentionally distribute and cause to be distributed a substance containing a detectable amount of cocaine, a Schedule II narcotic controlled substance, to wit: approximately three (3) ounces of cocaine to William Mead.

In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

45

## COUNT EIGHTEEN

THE GRAND JURY FURTHER CHARGES THAT:

On or about August 2, 1990, in the Eastern District of
Pennsylvania and elsewhere, LARRY BROWN did knowingly and
intentionally distribute and cause to be distributed a substance
which contains a detectable amount of cocaine, a Schedule II
narcotic controlled substance, to wit: approximately nine (9)
ounces of cocaine to Darrell Jamison.

In violation of Title 21, United States Code, Section
841(a)(1) and Title 18, United States Code, Section 2.

46

## COUNT NINETEEN

THE GRAND JURY FURTHER CHARGES THAT:

On or about August 31, 1990, in the Eastern District of Pennsylvania and elsewhere, LEROY JACKSON, a/k/a "Skip," did knowingly and intentionally distribute and cause to be distributed fifty (50) grams or more of a substance which contains a detectable amount of cocaine base, a Schedule II narcotic controlled substance, to wit: approximately one-hundred and sixty-six (166) grams of cocaine base to Darrell Jamison and DEA Special Agent Philip Davis.

In violation of Title 21, United States Code, Section 841(a)(1) and 18, United States Code, Section 2.

47

## COUNT TWENTY

THE GRAND JURY FURTHER CHARGES THAT:

On or about October 12, 1990, in the Eastern District of Pennsylvania and elsewhere, REGINALD REAVES, a/k/a "Reggie," did knowingly and intentionally distribute and cause to be distributed a substance containing a detectable amount of cocaine, a Schedule II narcotic controlled substance, to wit: approximately three (3) ounces of cocaine to William Mead.

In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

## COUNT TWENTY-ONE

THE GRAND JURY FURTHER CHARGES THAT:

On or about August 23, 1991, in the Eastern District of Pennsylvania and elsewhere, BERNARD FIELDS, a/k/a "Quadir,", a/k/a "Q," did knowingly and intentionally possess with intent to distribute five (5) kilograms or more of a substance containing a detectable amount of cocaine, a Schedule II narcotic controlled substance, to wit: approximately ten (10) kilograms of cocaine.

In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

## COUNT TWENTY-TWO

THE GRAND JURY FURTHER CHARGES THAT:

On or about August 23, 1991, in the Eastern District of Pennsylvania and elsewhere, BERNARD FIELDS, a/k/a "Quadir," a/k/a "Q" did knowingly and intentionally use and carry a firearm, to wit: a .380 caliber, Davis Industries, model P380, semi-automatic handgun, serial number AP108116, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, that is, possessing with intent to distribute a controlled substance as charged in Count Twenty-One (21) of this Indictment.

In violation of Title 18, United States Code, Section 924(c)(1).

## COUNT TWENTY-THREE

THE GRAND JURY FURTHER CHARGES THAT:

On or about August 23, 1991, in Philadelphia, in the Eastern District of Pennsylvania, BERNARD FIELDS, a/k/a "Quadir," a/k/a "Q," having been previously convicted in a court of the Commonwealth of Pennsylvania of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess a firearm in and affecting interstate commerce and knowingly and unlawfully received a firearm which had been shipped and transported in interstate commerce, to wit: a .380 caliber, Davis Industries, model P380, semi-automatic handgun, serial number AP108116; a .38 caliber, Smith and Wesson, model 10, revolver, serial number D716250; and a .357 caliber, Smith and Wesson, model 66, revolver, serial number 4K64719.

In violation of Title 18, United States Code, Section 922(g)(1).

## COUNT TWENTY-FOUR

THE GRAND JURY FURTHER CHARGES THAT:

1.   From in or about late 1985 through in or about
September 1991, in the Eastern District of Pennsylvania and
elsewhere, AARON JONES, a/k/a "A," a/k/a "J," did knowingly and
intentionally violate subchapter I of the Controlled Substances
Act, Title 21, United States Code, Section 841(a)(1) and Section
846, as alleged in Counts ONE, THREE, EIGHT, NINE, TEN and ELEVEN
of this Indictment, all of which are realleged and incorporated
by reference herein as if set forth fully and which are
punishable by imprisonment for more than one year, and did
knowingly and intentionally engage in a continuing criminal
enterprise in violation of Title 21, United States Code, Section
848, in that he did violate Title 21, United States Code,
Sections 841(a)(1) and 846, as alleged in Counts ONE, THREE,
EIGHT, NINE, TEN and ELEVEN of this Indictment, all of which are
realleged and incorporated by reference herein as if set forth
fully.

2.   As the result of the commission of the violations
of Subchapter I of the Controlled Substances Act and from his
engagement in the continuing criminal enterprise as alleged
above, AARON JONES, shall forfeit to the United States of
America:  (a) any and all property constituting and derived from
any proceeds obtained, directly or indirectly, as a result of
such violations of Subchapter I of the Controlled Substances Act;
(b) any and all property used and intended to be used in any

52

manner or part, to commit and to facilitate the commission of
such violations of Subchapter I of the Controlled Substances Act;
and (c) any interest in, claims against, and property and
contractual rights of any kind that afforded a source of control
over the enterprise; including but not limited to the approximate
sum of $36,785,000 in United States currency, or its equivalent,
which was received, directly or indirectly, by AARON JONES in
exchange for the distribution of controlled substances during the
period from in or about late 1985 through in or about September
1991, as alleged in COUNTS ONE, THREE, EIGHT, NINE, TEN and
ELEVEN of this Indictment.

        3.    If any of the property described above, as a
result of any act or omission of defendant AARON JONES,

               (a)   cannot be located upon the exercise of due
                     diligence;

               (b)   has been transferred to, sold to, or
                     deposited with a third party;

               (c)   has been placed beyond the jurisdiction of
                     the Court;

               (d)   has been substantially diminished in value;
                     or

               (e)   has been commingled with other property which
                     cannot be divided without difficulty;

then any other property of AARON JONES up to the value of the
property described above shall be forfeited to the United States
of America.

        All In violation of Title 21, United States Code,
Section 853.

## COUNT TWENTY-FIVE

THE GRAND JURY FURTHER CHARGES THAT:

1.     From in or about late 1985 through in or about September 1991, in the Eastern District of Pennsylvania and elsewhere, JAMES COLE did knowingly and intentionally violate subchapter I of the Controlled Substances Act, Title 21, United States Code, Section 841(a)(1) and Section 846, as alleged in Counts ONE, TWO, FIVE, SIX, SEVEN and EIGHT of this Indictment, all of which are realleged and incorporated by reference herein as if set forth fully and which are punishable by imprisonment for more than one year, and did knowingly and intentionally engage in a continuing criminal enterprise in violation of Title 21, United States Code, Section 848, in that he did violate Title 21, United States Code, Sections 841(a)(1) and 846, as alleged in Counts ONE, TWO, FIVE, SIX, SEVEN and EIGHT of this Indictment, all of which are realleged and incorporated by reference herein as if set forth fully.

2.     As the result of the commission of the violations of Subchapter I of the Controlled Substances Act and from his engagement in the continuing criminal enterprise as alleged above, JAMES COLE shall forfeit to the United States of America: (a) any and all property constituting and derived from any proceeds obtained, directly or indirectly, as a result of such violations of Subchapter I of the Controlled Substances Act;  (b) any and all property used and intended to be used in any manner or part, to commit and to facilitate the commission of such

54

violations of Subchapter I of the Controlled Substances Act; and (c) any interest in, claims against, and property and contractual rights of any kind that afforded a source of control over the enterprise; including but not limited to the approximate sum of $6,230,000 in United States currency, or its equivalent, which was received, directly or indirectly, by JAMES COLE in exchange for the distribution of controlled substances during the period from in or about late 1985 through in or about September 1991, as alleged in COUNTS ONE, TWO, FIVE, SIX, SEVEN and EIGHT of this Indictment.

      3.   If any of the property described above, as a result of any act or omission of defendant JAMES COLE,

     (a)  cannot be located upon the exercise of due diligence;

     (b)  has been transferred to, sold to, or deposited with a third party;

     (c)  has been placed beyond the jurisdiction of the Court;

     (d)  has been substantially diminished in value; or

     (e)  has been commingled with other property which cannot be divided without difficulty;

then any other property of JAMES COLE up to the value of the property described above shall be forfeited to the United States of America.

      All in violation of Title 21, United States Code, Section 853.

## COUNT TWENTY-SIX

THE GRAND JURY FURTHER CHARGES THAT:

1.  From in or about late 1985 through in or about
September 1991, in the Eastern District of Pennsylvania and
elsewhere, BRYAN THORNTON, a/k/a "Moochie," did knowingly and
intentionally violate subchapter I of the Controlled Substances
Act, Title 21, United States Code, Section 841(a)(1) and Section
846, as alleged in Counts ONE, FOUR and ELEVEN of this
Indictment, ell of which are realleged and incorporated by
reference herein as if set forth fully and which are punishable
by imprisonment for more than one year, and did knowingly and
intentionally engage in a continuing criminal enterprise in
violation of Title 21, United States Code, Section 848, in that
he did violate Title 21, United States Code, Sections 841(a)(1)
and 846, as alleged in Counts ONE, FOUR and ELEVEN of this
Indictment, all of which are realleged and incorporated by
reference herein as if set forth fully.

2.  As the result of the commission of the violations
of Subchapter I of the Controlled Substances Act and from his
engagement in the continuing criminal enterprise as alleged
above, BRYAN THORNTON, shall forfeit to the United States of
America:  (a) any and all property constituting and derived from
any proceeds obtained, directly or indirectly, as a result of
such violations of Subchapter I of the Controlled Substances Act;
(b) any and all property used and intended to be used in any
manner or part, to commit and to facilitate the commission of

56

such violations of Subchapter I of the Controlled Substances Act;
and (c) any interest in, claims against, and property and
contractual rights of any kind that afforded a source of control
over the enterprise; including but not limited to the approximate
sum of $36,785,000 in United States currency, or its equivalent,
which was received, directly or indirectly, by BRYAN THORNTON, in
exchange for the distribution of controlled substances during the
period from in or about late 1985 through in or about September
1991, as alleged in COUNTS ONE, FOUR and ELEVEN of this
Indictment.

      3.   If any of the property described above, as a
result of any act or omission of defendant BRYAN THORNTON,

> (a) cannot be located upon the exercise of due
>     diligence;
>
> (b) has been transferred to, sold to, or
>     deposited with a third party;
>
> (c) has been placed beyond the jurisdiction of
>     the Court;
>
> (d) has been substantially diminished in value;
>     or
>
> (e) has been commingled with other property which
>     cannot be divided without difficulty;

then any other property of BRYAN THORNTON up to the value of the
property described above shall be forfeited to the United States
of America.

      All In violation of Title 21, United States Code,
Section 853.

## COUNT TWENTY-SEVEN

THE GRAND JURY FURTHER CHARGES THAT:

1.    In committing the offenses alleged in Counts ONE, TWELVE and SIXTEEN of this Indictment, all of which are realleged and incorporated by reference herein as if set forth fully and which are punishable by imprisonment for more than one year, BERNARD FIELDS, a/k/a "Quadir," a/k/a "Q," did knowingly and intentionally distribute and cause to be distributed controlled substances, to wit: cocaine and heroin, schedule II narcotic controlled substances, in violation of Subchapter I of the Controlled Substances Act, Title 21, United States Code, Section 841(a)(1).

2.    As a result of the commission of the violations of Subchapter I of the Controlled Substances Act, Title 21, United States Code, Section 841(a)(1) BERNARD FIELDS, shall forfeit to the United States of America:  (a) any property constituting and derived from any proceeds obtained, directly or indirectly, as a result of such violations of Subchapter I of the Controlled Substances Act; and (b) any property used and intended to be used in any manner or part, to commit and to facilitate the commission of such violations of Subchapter I of the Controlled Substances Act, including, but not limited to the approximate sum of $4,100 in United States currency which BERNARD FIELDS, received in exchange for controlled substances as alleged in Counts ONE, TWELVE And SIXTEEN of this Indictment.

3.   If any of the property described above, as a result of any act or omission of defendant BERNARD FIELDS,

> (a)   cannot be located upon the exercise of due diligence;
>
> (b)   has been transferred to, sold to, or deposited with a third party;
>
> (c)   has been placed beyond the jurisdiction of the Court;
>
> (d)   has been substantially diminished in value; or
>
> (e)   has been commingled with other property which cannot be divided without difficulty;

then any other property of BERNARD FIELDS up to the value of the property described above shall be forfeited to the United States of America.

In violation of Title 21, United States Code, Section 853.

## COUNT TWENTY-EIGHT

THE GRAND JURY FURTHER CHARGES THAT:

1.    In committing the offenses alleged in Counts ONE, THIRTEEN and FIFTEEN of this Indictment, all of which are realleged and incorporated by reference herein as if set forth fully and which are punishable by imprisonment for more than one year, SHAWN DAVIS, a/k/a "SW1," and BERNARD FIELDS, a/k/a "Quadir," a/k/a "Q" did knowingly and intentionally distribute and cause to be distributed controlled substances, to wit: cocaine and heroin, schedule II narcotic controlled substances, in violation of Subchapter I of the Controlled Substances Act, Title 21, United States Code, Section 841(a)(1).

2.    As a result of the commission of the violations of Subchapter I of the Controlled Substances Act, Title 21, United States Code, Section 841(a)(1), SHAWN DAVIS and BERNARD FIELDS, shall jointly and severally forfeit to the United States of America: (a) any property constituting and derived from any proceeds obtained, directly or indirectly, as a result of such violations of Subchapter I of the Controlled Substances Act; and (b) any property used and intended to be used in any manner or part, to commit and to facilitate the commission of such violations of Subchapter I of the Controlled Substances Act, including, but not limited to the approximate sum of $3,400 in United States currency, which SHAWN DAVIS and BERNARD FIELDS, received in exchange for controlled substances as alleged in Counts ONE, THIRTEEN and FIFTEEN of this Indictment.

3.    If any of the property described above, as a result of any act or omission of defendants SHAWN DAVIS and BERNARD FIELDS,

    (a)  cannot be located upon the exercise of due diligence;

    (b)  has been transferred to, sold to, or deposited with a third party;

    (c)  has been placed beyond the jurisdiction of the Court;

    (d)  has been substantially diminished in value; or

    (e)  has been commingled with other property which cannot be divided without difficulty;

then any other property of SHAWN DAVIS or BERNARD FIELDS or both of them, up to the value of the property listed above shall be forfeited to the United States of America.

    All in violation of Title 21, United States Code, Section 853.

61

## COUNT TWENTY-NINE

THE GRAND JURY FURTHER CHARGES THAT:

1.    In committing the offenses alleged in Counts ONE and SEVENTEEN of this Indictment, all of which are realleged and incorporated by reference herein as if set forth fully and which are punishable by imprisonment for more than one year, MICHAEL WILLIAMS did knowingly and intentionally distribute and cause to be distributed controlled substances, to wit: cocaine, a schedule II narcotic controlled substance, in violation of Subchapter I of the Controlled Substances Act, Title 21, United States Code, Section 841(a)(1).

2.    As a result of the commission of the violations of Subchapter I of the Controlled Substances Act, Title 21, United States Code, Section 841(a)(1) MICHAEL WILLIAMS shall forfeit to the United States of America:  (a) any property constituting and derived from any proceeds obtained, directly or indirectly, as a result of such violations of Subchapter I of the Controlled Substances Act; and (b) any property used and intended to be used in any manner or part, to commit and to facilitate the commission of such violations of Subchapter I of the Controlled Substances Act, including, but not limited to the approximate sum of $3,600 in United States currency, which MICHAEL WILLIAMS received in exchange for controlled substances as alleged in Counts ONE and SEVENTEEN of this Indictment.

3.    If any of the property described above, as a result of any act or omission of defendant MICHAEL WILLIAMS,

62

(a)   cannot be located upon the exercise of due diligence;

(b)   has been transferred to, sold to, or deposited with a third party;

(c)   has been placed beyond the jurisdiction of the Court;

(d)   has been substantially diminished in value; or

(e)   has been commingled with other property which cannot be divided without difficulty;

then any other property of MICHAEL WILLIAMS up to the value of the property described above shall be forfeited to the United States of America.

All in violation of Title 21, United States Code, Section 853.

## COUNT THIRTY

THE GRAND JURY FURTHER CHARGES THAT:

1.    In committing the offenses alleged in Counts ONE and EIGHTEEN of this Indictment, all of which are realleged and incorporated by reference herein as if set forth fully and which are punishable by imprisonment for more than one year, LARRY BROWN did knowingly and intentionally distribute and cause to be distributed a controlled substance, to wit: cocaine, a schedule II narcotic controlled substances, in violation of Subchapter I of the Controlled Substances Act, Title 21, United States Code, Section 841(a)(1).

2.    As a result of the commission of the violations of Subchapter I of the Controlled Substances Act, Title 21, United States Code, Section 841(a)(1) LARRY BROWN shall forfeit to the United States of America:  (a) any property constituting and derived from any proceeds obtained, directly or indirectly, as a result of such violations of Subchapter I of the Controlled Substances Act; and (b) any property used and intended to be used, in any manner or part, to commit and to facilitate the commission of such violations of Subchapter I of the Controlled Substances Act, including, but not limited to the approximate sum of $9,000 in United States currency, which LARRY BROWN received in exchange for controlled substances as alleged in Counts ONE and EIGHTEEN of this Indictment.

3.    If any of the property described above, as a result of any act or omission of LARRY BROWN,

(a)   cannot be located upon the exercise of due
      diligence;

(b)   has been transferred to, sold to, or
      deposited with a third party;

(c)   has been placed beyond the jurisdiction of
      the Court;

(d)   has been substantially diminished in value;
      or

(e)   has been commingled with other property which
      cannot be divided without difficulty;

then any other property of LARRY BROWN up to the value of the

property listed above shall be forfeited to the United States of

America.

All in violation of Title 21, United States Code,

Section 853.

Case 2:91-cr-00570-ER Document 1 Filed 10/02/91 Page 66 of 69

## COUNT THIRTY-ONE

THE GRAND JURY FURTHER CHARGES THAT:

1.  In committing the offenses alleged in Counts ONE
and NINETEEN of this Indictment, all of which are realleged and
incorporated by reference herein as if set forth fully and which
are punishable by imprisonment for more than one year, LEROY
JACKSON, a/k/a "Skip" did knowingly and intentionally distribute
and cause to be distributed controlled substances, to wit:
cocaine, a schedule II narcotic controlled substance, in
violation of Subchapter I of the Controlled Substances Act, Title
21, United States Code, Section 841(a)(1).

2.  As a result of the commission of the violations of
Subchapter I of the Controlled Substances Act, Title 21, United
States Code, Section 841(a)(1) LEROY JACKSON, shall forfeit to
the United States of America:  (a) any property constituting and
derived from any proceeds obtained, directly or indirectly, as a
result of such violations of Subchapter I of the Controlled
Substances Act; and (b) any property used and intended to be used
in any manner or part, to commit and to facilitate the commission
of such violations of Subchapter I of the Controlled Substances
Act, including, but not limited to the approximate sum of $7,400
in United States currency, LEROY JACKSON, received in exchange
for controlled substances as alleged in Counts ONE and NINETEEN
of this Indictment.

66

3.    If any of the property described above, as a result of any act or omission of defendant LEROY JACKSON,

      (a)  cannot be located upon the exercise of due diligence;

      (b)  has been transferred to, sold to, or deposited with a third party;

      (c)  has been placed beyond the jurisdiction of the Court;

      (d)  has been substantially diminished in value; or

      (e)  has been commingled with other property which cannot be divided without difficulty;

then any other property of the LEROY JACKSON, up to the value of the property listed above shall be forfeited to the United States of America.

In violation of Title 21, United States Code, Section 853.

67

## COUNT THIRTY-TWO

THE GRAND JURY FURTHER CHARGES THAT:

1.   In committing the offenses alleged in Counts ONE and TWENTY of this Indictment, all of which are realleged and incorporated by reference herein as if set forth fully and which are punishable by imprisonment for more than one year, REGINALD REAVES, a/k/a "Reggie," did knowingly and intentionally distribute and cause to be distributed controlled substances, to wit: cocaine, a schedule II narcotic controlled substance, in violation of Subchapter I of the Controlled Substances Act, Title 21, United States Code, Section 841(a)(1).

2.   As a result of the commission of the violations of Subchapter I of the Controlled Substances Act, Title 21, United States Code, Section 841(a)(1) REGINALD REAVES shall forfeit to the United States of America:  (a) any property constituting and derived from any proceeds obtained, directly or indirectly, as a result of such violations of Subchapter I of the Controlled Substances Act; and (b) any property used and intended to be used, in any manner or part, to commit and to facilitate the commission of such violations of Subchapter I of the Controlled Substances Act, including, but not limited to the approximate sum of $3,000 in United States currency, REGINALD REAVES, received in exchange for controlled substances as alleged in Counts ONE and TWENTY of this Indictment.

3.   If any of the property described above, as a result of any act or omission of defendant REGINALD REAVES,

68

(a)   cannot be located upon the exercise of due diligence;

(b)   has been transferred to, sold to, or deposited with a third party;

(c)   has been placed beyond the jurisdiction of the Court;

(d)   has been substantially diminished in value; or

(e)   has been commingled with other property which cannot be divided without difficulty;

then any other property of REGINALD REAVES up to the value of the property described above shall be forfeited to the United States of America.

All in violation of Title 21, United States Code, Section 853.

A TRUE BILL:

_____
Foreperson

MICHAEL M. BAYLSON
United States Attorney